# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**MYRA BROUSSARD**                                            **CIVIL ACTION**

**VERSUS**

**BOARD OF SUPERVISORS OF**                    **NO. 19-00527-BAJ-RLB**
**LOUISIANA STATE UNIVERSITY**
**AND A & M COLLEGE, ET AL.**

## RULING AND ORDER

Before the Court is Defendants' second **Motion For Summary Judgment (Doc. 55)**, seeking dismissal of Plaintiff's claims of defamation, discharge in violation of due process, unpaid wages, and reprisal. Plaintiff opposes Defendants' Motion. (Doc. 58). For reasons to follow, Defendants' Motion will be granted in part, and Plaintiff's claim of reprisal in violation of La. R.S. 23:631 will be dismissed with prejudice. In all other respects, Defendants' Motion will be denied.

## I.  SUMMARY JUDGMENT EVIDENCE

This is an employment dispute. The parties agree to nothing, save that Defendants employed Plaintiff at some undefined term. (Doc. 49 at § F). Indeed, the summary judgment materials present wildly divergent interpretations of the conflict, to such an extent that the Court questions the candor of *each* side.[1] Lacking a credible presentation of the material facts controlling this dispute, the Court has conducted its own review of the summary judgment evidence, which  establishes the following:

Plaintiff is a teacher and school administrator with 30 years' experience in the

---

[1] Going forward, the parties would do well to present their *facts* succinctly and without bias, reserving *argument* for the appropriate time.

field of public education. In 2000, Plaintiff joined the Louisiana State University ("LSU") Laboratory School—currently known as University Laboratory School ("ULS")—as a teacher. ULS operates under the authority and administration of LSU, and is part of LSU's College of Human Sciences and Education ("CHSE"). ULS administration and faculty are employees of LSU.

Plaintiff served at ULS for twenty years and, over that time, held various positions, including roles as a teacher, assistant principal, and principal. Despite her long employment history, Plaintiff never obtained tenure, because tenure is not available to ULS employees. (*See* Doc. 39).

In spring 2016, ULS officials began discussing the possibility of establishing an aftercare program—called "Cub Care"—to serve ULS students in grades kindergarten through eighth. At that time, Plaintiff was ULS's elementary school principal, and participated in the planning of Cub Care. The parties intended that Cub Care would begin at the start of the 2016-2017 school year, and that Plaintiff would play a leading role in the program. On March 31, 2016, ULS's superintendent, Wade Smith, circulated a memorandum to the LSU Human Resources Department reflecting the same. In relevant part, this memo stated:

RE:    Salary Increase

…

With the expanded duties and reorganization of the University Laboratory School's administration, I would like to increase both Frank Rusciano (Principal of 6th - 12th Grade) and Myra Broussard (Principal of K-5th Grade) salary's [sic] to $120,000 a year.

As we have adjusted to a smaller but efficient administration, the duties beyond the normal school hours have unexpectedly increased for one

person alone. Therefore, both Principals (Frank and Myra) will share the after hour duties required to maintain the school's extracurricular and curriculum related activities. Their salaries should be reflected as listed above.

I thank you for your consideration of this request and look forward to hearing from you at your earliest convenience.

(Doc. 55-3 at 11).

Time passed, and the parties' plans for Cub Care continued to evolve. At some point, Plaintiff and Mr. Rusciano submitted a proposed budget to ULS's Accounting Specialist Supervisor, Natalie Long. (Doc. 58-5 at 1). According to Ms. Long, this proposed Cub Care budget included compensation for Plaintiff and Mr. Rusciano *in addition to* the salaries quoted in Superintendent Smith's March 31 memorandum, totaling $1,500 per month (or $15,000 over the ten-month school year). (*Id.*). Superintendent Smith, Ms. Long, *and* Dr. Damon Andrew, Dean of LSU's CHSE, approved Plaintiff's proposed Cub Care budget. (*Id.*). Plaintiff's additional Cub Care pay was also reflected on official Personnel Action Forms completed by ULS's Human Resources Department. (*Id.*) Superintendent Smith "approved [Plaintiff's] Personnel Action Form[] via electronic signature." (*Id.*)

After Superintendent Smith and Dean Andrew approved the Cub Care budget, Ms. Long "opened a separate account with LSU to maintain monies associated with the program, including all expenditures, income, and [Plaintiff's] and Mr. Rusciano's additional pay." (Doc. 58-5 at 1).

Cub Care commenced in fall 2016. As planned, Plaintiff and Mr. Rusciano ran the program. Yet, despite Plaintiff's budget having been approved, she did not receive any additional pay. (*See* Doc. 58-5 at 1; Doc. 58-2 at 152-153; Doc. 58-3 at 2).

Beginning in October 2016, Plaintiff raised concerns about the unpaid wages on various occasions. Plaintiff's inquiries, in turn, prompted multiple internal conversations at ULS and LSU. In sum, these conversations reflect confusion regarding Plaintiff's correct salary. In particular, on October 26, 2016, Niki Norton, LSU's Human Resource Management Director, emailed Superintendent Smith stating that LSU *had* "received requests to pay both Myra and Frank $15,000 each" to compensate for Cub Care duties, yet could not "approve the requests as submitted" because any such duties "would be an expectation of [their current jobs]," and "the rate is quite significant." (Doc. 55-3 at 18). Superintendent Smith responded, indicating that his approval of Plaintiff's and Mr. Rusciano's additional salaries was a mistake:

> OK...now you caught me 'nappin' [sic] There should be no request...I was just punching buttons off my phone. They haven't requested payment, we haven't discussed payment, and there's certainly no approval of payment. This [Cub Care] is a service we offer to our parents and there is not administrative salary involved.
>
> I guess I better start reading those things! 😊
>
> (Doc. 55-3 at 18)

Over the course of the 2016-2017 school year, Plaintiff continued to make requests for her unpaid Cub Care wages, and even initiated an administrative grievance with LSU. Still, Defendants refused to pay Plaintiff any additional salary.

Meantime, Plaintiff and Mr. Rusciano administered Cub Care, and also engaged in ongoing conversations with ULS administration regarding potential changes to the program. These conversations included discussions about whether to establish Cub Care as a separate legal entity from ULS, capable of conducting its own

affairs, maintaining its own accounts, and paying its own expenses. Consistent with these conversations, Plaintiff registered the tradename "Cub Care, LLC" with the Louisiana Secretary of State, and obtained an employer identification number for Cub Care, LLC from the IRS.

Conflicts among the parties escalated as they prepared for the beginning of the 2017-2018 school year. First, Defendants increased Plaintiff's annual salary by $15,000 to account for her anticipated *future* Cub Care responsibilities, yet refused to make the raise retroactive to the 2016-2017 year.

Second, a dispute arose regarding Plaintiff's handling of funds designated for Cub Care, and whether such funds (and related expenses) should be administered through a ULS account, or a separate Cub Care, LLC account. This dispute came to a head on September 1, 2017, when Superintendent Smith sent Plaintiff a terse email demanding that Plaintiff immediately "process all funds on hand related to [Cub Care]," and warning that "[f]ailure to comply with this directive may result in appropriate disciplinary action." (Doc. 55-3 at 30).

Third, as a result of the funds-management dispute, LSU initiated an internal audit of the Cub Care program. This audit was completed on September 28, 2018 (the "September 28 Audit"), and resulted in multiple detrimental findings questioning Plaintiff's ethics and integrity. (Doc. 58-10 at 36-40). Notably, LSU's September 28 Audit found that Superintendent Smith "approved" Plaintiff's additional compensation for the 2016-2017 school year. (Doc. 58-10 at 37). The September 28 Audit further determined, however, that after Defendants refused Plaintiff's requests

for additional pay, Plaintiff and Mr. Rusciano took matters in their own hands, and concocted a brazen plot to claw back their unpaid wages by redirecting ULS funds through Cub Care, LLC. The September 28 Audit summarized its findings as follows:

> Finding No. 2: Actions Taken by ULS Employees to Circumvent University Policy
>
> The two ULS Principals [Plaintiff and Mr. Rusciano] took actions which, if fully realized, would have resulted in the redirection of ULS student payments for aftercare from ULS to a private company [Cub Care, LLC] that the two Principals were to jointly own. These actions were prompted by a dispute with University management regarding proposed additional compensation for administrative activities performed by the Principals related to the ULS aftercare program operated during the 2016-2017 Academic Year. Consequently, the Principals' actions appear to represent an attempt to circumvent University management's disapproval of the proposed additional compensation.

(Doc. 58-10 at 36). Thereafter, the September 28 Audit listed multiple "actions … taken by the Principals as a means to ensure payment to themselves for services provided to the Aftercare program should efforts to have the University reconsider the prior disapproval of additional compensation fail." Specifically, the September 28 Audit found that Plaintiff:

- Reserved the business name, "Cub Care, LLC" with the Louisiana Secretary of State's Office

- Obtained an Employer Identification Number from the IRS in the name of "Cub Care, LLC"

- With the assistance of the Superintendent's Office, drafted and distributed to parents of students instructions on registering for aftercare with Cub Care, LLC, along with Cub Care, LLC contract [sic] directing payment to "Cub Care, LLC" and authorizing Cub Care, LLC to charge participation credit cards for the duration of the ten-month period

- Withheld participation payments from deposit into a University

account to ensure that they (the Principals) would get paid[.]
(Doc. 58-10 at 39).

LSU initially distributed the September 28 Audit internally to nine recipients, including LSU President F. King Alexander; LSU Vice President and General Counsel Tom Skinner; LSU Interim Executive Vice President and Provost Stacia Haynie; and LSU Executive Vice President for Finance and Administration Dan Layzell. (Doc. 58-10 at 44). Thereafter, LSU provided a copy of the September 28 Audit to the Louisiana Legislative Auditor. In turn, the Legislative Auditor included the September 28 Audit's findings *verbatim* in its March 13, 2019 public report titled "LSU and Related Campuses," (the "March 13 Report"). (Doc. 55-3 at 75-78).

Plaintiff's situation went from bad to worse in the wake of LSU's September 28 Audit and the Legislative Auditor's March 13 Report. First, on January 3, 2019, Defendants provided Plaintiff a written "Final Notice of Professional Concerns" (the "January 3 Final Notice"), stating that due to the ethical and policy violations set forth in the September 28 Audit, Plaintiff's performance would be "monitored," and Plaintiff would be terminated "if significant improvement is not shown, or if there is another violation of policy or law." (Doc. 55-4 at 10-11). The January 3 Final Notice specifically clarified Defendants' expectations regarding "significant improvement" as follows:

> By significant improvement, we expect you to exhibit the same level of professional judgement and conduct that is expected of all employees. Job tasks that are assigned to you are expected to be completed as per instruction and within the parameters of state law and University policies. We are asking that you work with us to make your employment

successful.

(Doc. 55-4 at 10-11).

Second, beginning in mid-March 2019, multiple state-wide media outlets reported the findings set forth in the Legislative Auditor's March 13 Report, and included Plaintiff's name and picture in their reports. (*See* Doc. 55-4 at 16-26). These media reports quoted LSU officials stating that Plaintiff and Mr. Rusciano were the subjects of "personnel actions," and that the "outcomes" of such actions "are in process and will be completed no later than June 30, 2019." (Doc. 55-4 at 19).

Third, shortly after these media reports aired, on March 20, 2019, Plaintiff sought a meeting with ULS Board Member Richard Lipsey, where she shared her concerns that she was being "targeted, slandered, defamed and harassed" by ULS and LSU officials. (Doc. 58-2 at 319). Plaintiff linked her concerns directly to "the inaccurate audit," which she characterized as an "attempt[] to turn our own community members against [me]," and "an obvious attempt to undermine long-term relationships through fake news reporting. (*Id.*).

Fourth, on May 22, 2019, Plaintiff was unexpectedly summoned to a meeting with Amy Westbrook, ULS's new Interim Superintendent (Superintendent Smith left ULS in January 2019). At this meeting, Dr. Westbrook stated that Plaintiff would be removed from her principal position effective June 22, 2019. Plaintiff asked for a reason, to which Dr. Westbrook responded that "she didn't have to give one." (Doc. 58-2 at 126). Prior to this May 22 meeting, Plaintiff was unaware of any concerns regarding her performance as principal, other than those stated in the January 3 Final Notice. (Doc. 58-2 at 127-128). In fact, Plaintiff's performance was "rated

exceptional" in her most recent evaluation, in spring 2018. (Doc. 58-2 at 134). Further, despite ULS's policy requiring "progressive discipline" prior to termination, Defendants never provided Plaintiff any indication that she had failed to exhibit "significant improvement" as set forth in the January 3 Final Notice. (*See* Doc. 58-10 at 123-124).

Fifth, also on May 22, 2019, Plaintiff received written notice that "[e]ffective June 22, 2019, your services will no longer be required as Principal. You will return to your 9-month faculty responsibilities as an Instructor in the Fall." (Doc. 55-4 at 27). This notice further stated that, as a result of her demotion, Plaintiff's pay would be reduced by $25,000. (*Id.*). Finally, the notice stated that "your academic appointment with LSU will not be renewed and your employment with LSU will end on May 22, 2020." (*Id.*).

After learning of her demotion and nonrenewal, Plaintiff requested a hearing to clear her name of the allegations set forth in the September 28 Audit, and further requested that Defendants issue a statement clarifying that her termination was not a result of the Audit. (Doc. 58-2 at 135-136). Defendants did not respond to either request. (*Id.*).

Plaintiff's employment at ULS terminated on May 22, 2020, as stated in the May 22, 2019 written notice.

## II.  RELEVANT PROCEDURAL HISTORY

Plaintiff initiated this action on July 18, 2019, asserting that she is entitled to unpaid wages and various additional damages resulting from Defendants' actions described above. (Doc. 1-2).

On November 6, 2019, Defendants filed their first motion for summary judgment, seeking a ruling that Plaintiff is not protected by Louisiana's teacher tenure laws, La. R.S. § 17:441, *et seq.*, and dismissal of all claims based "on a claim of tenured employment." (Doc. 11 at 1).

On July 27, 2020, the Court issued its Order granting Defendants' first motion for summary judgment, determining that the plain terms of Plaintiff's employment contract precluded Plaintiff from acquiring tenure at ULS. (Doc. 39 at 6).

Now, Defendants seek summary judgment dismissing Plaintiff's claims of defamation, discharge in violation of due process, unpaid wages, and reprisal, contending that Plaintiff has failed to adduce sufficient evidence to support her claims. (Docs. 55, 56). Plaintiff opposes Defendants' Motion. (Doc. 58).[2]

## III.    ANALYSIS

### A. Standard

Federal Rule of Civil Procedure 56 provides that the Court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to

---

[2] This Court's Local Rules require that the moving party must seek leave and demonstrate good cause prior to filing a successive motion for summary judgment. M.D. La. LR 56(h). On July 1, 2020, Defendants filed their original motion for leave to file a successive summary judgment motion, and followed on August 5, 2020 with a re-urged and clarified motion for leave. (Docs. 29, 44). On March 2, 2021, the Court granted Defendants' request, determining that "entertaining Defendants' successive motion is an efficient use of judicial resources because it seeks dismissal of Plaintiff's remaining claims, and, even if Defendants do not achieve a full dismissal, a ruling will likely narrow the issues in advance of trial." (Doc. 54 at 1).

find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Stated differently, "[i]f the party with the burden of proof cannot produce any summary judgment evidence on an essential element of his claim, summary judgment is required." *Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990).

"This Court has repeatedly admonished that summary judgment is about *evidence*, and a party that fails to direct the Court's attention to any evidence supporting his claims cannot carry his burden of showing a genuine, material dispute (or lack thereof)." *CMFG Life Ins. Co. v. Lee*, 20-cv-00157, 2021 WL 1395768, at *1 (M.D. La. Apr. 13, 2021) (Jackson, J.) (citing authorities).

### B. Discussion

The Court addresses Defendants' arguments in the order they are presented in Defendants' summary judgment memorandum. (*See* Doc. 56).

### i.  Defamation

Under Louisiana law, a claim of defamation requires proof of four elements: "(1) a false and defamatory statement about another; (2) an unprivileged publication to a third party; (3) fault on the part of the publisher; and, (4) a resulting injury." *LaRavia v. Cerise*, 462 F. App'x 459, 462 (5th Cir. 2012) (citing *Kennedy v. Sheriff of East Baton Rouge*, 935 So.2d 669, 674 (La. 2006)). Defendants challenge only the second element, arguing that Plaintiff's defamation claim fails because all defamatory statements at issue were made in good faith, during the course of LSU's internal audit of the Cub Care program, and are therefore entitled to a conditional privilege. (Doc. 56 at 13-14). Plaintiff counters that Defendants are not entitled to a

conditional privilege because Defendants are ultimately responsible for the defamatory statements appearing in the Legislative Auditor's March 13 Report, which resulted in widespread media coverage, and because, in any event, Defendants knew that the statements contained in the September 28 Audit were false. (Doc. 58 at 19, 21).

The Louisiana Supreme Court instructs that "determining whether a conditional privilege exists involves a two-step process." *Kennedy v. Sheriff of E. Baton Rouge*, 2005-1418 (La. 7/10/06), 935 So. 2d 669, 682. First, the Court must decide "whether the attending circumstances of a communication occasion a qualified privilege." *Id.* Second, the Court must determine "whether the privilege was abused, which requires that the grounds for abuse—malice or lack of good faith—be examined." *Id.* Importantly, "[w]hile the first step is generally determined by the court as a matter of law, the second step of determining abuse of a conditional privilege or malice is generally a fact question for the jury unless only one conclusion can be drawn from the evidence." *Id.* (quotation marks and alterations omitted).

Here, the "attending circumstances" certainly "occasion a qualified privilege." These statements appeared first in LSU's September 28 Audit, and then again in the Legislative Auditor's March 13 Report. LSU conducted the September 28 Audit pursuant to its ongoing obligation to investigate financial irregularities, and the results were initially distributed only among LSU and ULS employees. Accordingly, they are "intra-corporate communication[s] among officers or agents of the same corporation, in connection with their duties for the corporation," and are a privileged

communication of the corporation. *Jones v. S. Univ.*, No. 18-cv-1034, 2019 WL 3883109, at *8 (M.D. La. Aug. 16, 2019) (Dick, C.J.) (quotation marks omitted; citing authorities). Thereafter, Louisiana law *required* Defendants to provide the results to the Legislative Auditor. La. R.S. § 24:523. Further, Louisiana law provides that any report issued by the Legislative Auditor is a public document. La. R.S. § 24:513 (G)(1). Defendants did not control the Legislative Auditor's decision to include the September 28 Audit's findings in the March 13 Report, and therefore cannot be faulted for media coverage following the March 13 Report.

This leaves the question of whether Defendants abused the privilege by malice or lack of good faith. *See Kennedy*, 935 So. 2d at 682. Again, this "is generally a fact question for the jury unless only one conclusion can be drawn from the evidence." *Id.* (quotation marks and alterations omitted). Here, the Court determines that the evidence establishes a genuine, material dispute that should be decided by the jury. Notably, the September 28 Audit's most damning allegation—that Plaintiff surreptitiously schemed to line her own pockets by withholding student funds after ULS denied her request for additional compensation—is contradicted on the face of the Audit itself, which expressly finds that Superintendent Smith "approved" Plaintiff's additional compensation, and that Plaintiff thereafter conducted her actions vis-à-vis Cub Care "[w]ith the assistance of the Superintendent's Office." (Doc. 58-10 at 39).

These findings are supported by the contemporaneous communications among Plaintiff and Defendants, and raise serious questions regarding Defendants' motives

for the September 28 Audit *and* the accuracy of statements contained therein, particularly insofar as Plaintiff (and Mr. Rusciano) were singled out for violating university policy, yet Superintendent Smith was given a pass.

Here, as in other cases where evidence conflicts regarding the issue of abuse of privilege, "what constitutes truth depends completely on who is stating it." *Bradford v. Judson*, 44,092 (La. App. 2 Cir. 5/6/09), 12 So. 3d 974, 982 (denying defendant's motion for summary judgment seeking dismissal of plaintiff's defamation claim related to email alleging that plaintiff "stole" university alumni association funds), *writ denied*, 2009-1648 (La. 10/16/09), 19 So. 3d 482. More than one conclusion can be drawn from the evidence, and summary judgment must be denied. *See Kennedy*, 935 So. 2d at 682.

### ii.    Discharge In Violation Of Due Process

When "the government discharges an employee amidst allegations of misconduct, the employee may have a procedural due process right to notice and an opportunity to clear his name." *Bledsoe v. City of Horn Lake, Miss.*, 449 F.3d 650, 653 (5th Cir. 2006). Specifically, "a liberty interest is infringed, and the right to notice and an opportunity to clear one's name arises, … when the employee is discharged in a manner that creates a false and defamatory impression about him and thus stigmatizes him and forecloses him from other employment opportunities." *Id.* (quotation marks omitted).

The Court employs a seven-element "stigma-plus-infringement" test to determine whether the Due Process Clause affords a government employee a remedy for deprivation of liberty without notice or an opportunity to clear his name:

14

The plaintiff must show: (1) he was discharged; (2) stigmatizing charges were made against him in connection with the discharge; (3) the charges were false; (4) he was not provided notice or an opportunity to be heard prior to the discharge; (5) the charges were made public; (6) he requested a hearing to clear his name; and (7) the employer denied the request.

*Id.*

Defendants argue that Plaintiff's due process claim fails at the first element, because Plaintiff "was not discharged"; rather her contract was not renewed upon its expiration in May 2020. (Doc. 56 at 16-17).

Defendants' argument fails for two reasons. First, Defendants misstate the law of the U.S. Court of Appeals for the Fifth Circuit, which plainly holds that "stigma to reputation in conjunction with a *failure to rehire* a non-tenured employee states a claim … for deprivation of a Fourteenth Amendment liberty interest without due process." *Dennis v. S & S Consol. Rural High Sch. Dist.*, 577 F.2d 338, 342 (5th Cir. 1978) (emphasis added). As indicated above, the summary judgment evidence establishes a basis to conclude that Defendants defamed Plaintiff by accusing her of diverting ULS funds without approval or authorization. Thereafter, Defendants unquestionably decided not to renew Plaintiff's teacher contract following the 2019-2020 school year. The stigma associated with Defendants' accusations, combined with Defendants' non-renewal of Plaintiff's teacher contract, satisfies the requirements for a "discharge" under Fifth Circuit law, and defeats Defendants' request for summary judgment. *Id.*

Second, and in any event, Defendants' argument focuses exclusively on Defendants' decision not to renew Plaintiff's 2019-2020 *teacher* contract. Yet, Defendants *also* discharged Plaintiff from her duties under her 2018-2019 *principal*

15

contract. (Doc. 55-4 at 27). Defendants' briefing simply ignores this aspect of Plaintiff's claim, and "the Court will not speculate on arguments that have not been advanced, or attempt to develop arguments on Defendants' behalf." *Gray v. City of Denham Springs*, No. 19-cv-00889, 2021 WL 1187076, at *5 (M.D. La. Mar. 29, 2021) (Jackson, J.) (alterations omitted and quotation marks omitted). As noted above, it will be for the jury to decide whether Plaintiff's termination from her principal position establishes a "discharge" for purposes of her "stigma-plus-infringement" claim.

### iii. Unpaid Wages

Louisiana law provides that "[u]pon the discharge of any … employee of any kind whatever, it shall be the duty of the person employing such … employee to pay the amount then due under the terms of employment … on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first." La. R.S. § 23:631. "[A]ny employer who fails or refuses to comply with the provisions of R.S. 23:631 shall be liable to the employee either for ninety days wages at the employee's daily rate of pay, or else for full wages from the time the employee's demand for payment is made until the employer shall pay or tender the amount of unpaid wages due to such employee, whichever is the lesser amount of penalty wages." La. R.S. § 23:632.

> This statute is penal in nature and, therefore, must be strictly construed. Equitable defenses are available, and penalty wages are not to be absolutely imposed. Generally, when there is a good faith question of whether the employer actually owes past due wages, resistance to payment will not trigger penalty wages. However, when the employer is arbitrary, sets out procedural pitfalls for the employee, or is merely negligent in failing to pay past due wages, penalty wages will be

16

assessed. A trial court's findings of fact with regard to whether the plaintiff is entitled to penalty wages cannot be reversed on appeal in the absence of manifest error.

*Becht v. Morgan Buildings & Spas, Inc.*, 2001-1091 (La. App. 1 Cir. 6/21/02), 822 So. 2d 56, 58, *aff'd*, 2002-2047 (La. 4/23/03), 843 So. 2d 1109.

Plaintiff seeks recovery of the unpaid $15,000 promised to compensate for her 2017-2018 Cub Care duties. It is undisputed that, to this day, Defendants have not paid these wages. Still, Defendants argue that Plaintiff's claim must be dismissed because "LSU never approved the request for additional compensation for Broussard for the 2016-2017 Cub Care aftercare program." (Doc. 56 at 20).

On this point, the summary judgment evidence plainly establishes a material dispute. Specifically, Natalie Long's affidavit states that multiple LSU/ULS employees approved Plaintiff's additional compensation prior to the start of the 2016-2017 school year, *including* LSU CHSE Dean Andrew *and* ULS Superintendent Smith. (Doc. 58-5 at 1). LSU's internal audit corroborates Ms. Long's affidavit, stating expressly that Superintendent Smith "approved" Plaintiff's additional compensation for the 2016-2017 school year. (Doc. 58-10 at 37). Defendants' motion will be denied.[3]

---

[3] In their reply memorandum, Defendants argue that Plaintiff's unpaid wages claim fails because Defendants' approval of Plaintiff's additional salary was not "in compliance with PM-3 and PM-69." (Doc. 59 at 2). Again, Defendants' argument fails.

PM-3 is LSU's internal policy setting forth "the requirements and conditions for providing additional compensation." (Doc. 55-3 at 12). PM-69 "provide[s] for specific and express delegation of authority to execute personnel actions." (Doc. 55-3 at 15). Relevant here, PM-3 requires that "[a]ll requests for the consideration of supplemental pay must be approved in advance of the additional duties commencing," (Doc. 55-3 at 13); PM-69 states "that Chancellors or equivalents will delegate routine transactions [including salary supplements] to the Provost, vice chancellors, deans and department heads provided there is adequate review by the HRM Office or other appropriately trained office to ensure compliance with applicable regulations," (Doc. 55-3 at 16).

### iv.    Reprisal

The Louisiana whistleblower statute protects employees from adverse employment actions taken by employers in reprisal for disclosing or threatening to disclose "a workplace act or practice that is in violation of state law," and from objecting to or refusing to participate in any such violation. La. R.S. § 23:967. To establish a reprisal claim, the plaintiff must show: (1) the employer violated Louisiana law through a prohibited workplace practice; (2) the plaintiff advised the employer of the violation; (3) the plaintiff disclosed, threatened to disclose, or objected to the prohibited practice; and (4) the plaintiff suffered an adverse employment action as a result of her response to the prohibited practice. *See Herster v. Bd. of Supervisors of Louisiana State Univ.*, 887 F.3d 177, 187 (5th Cir. 2018). Importantly, the employee must prove that the employer "committed an *actual* violation of Louisiana law," *Id.* (emphasis in original; quotation marks and alterations omitted). "[T]he violation of law in question must be that of a state statute." *Hale v. Touro Infirmary*, 2004-0003 (La. App. 4 Cir. 11/3/04), 886 So. 2d 1210, 1216, *writ denied* 2005-0103 (La. 3/24/05), 896 So. 2d 1036.

Defendants argue that Plaintiff's reprisal claim fails because she cannot show that LSU committed an actual violation of Louisiana law that resulted in an adverse

---

Based on the policy provisions above, Defendants contend that any approval of Plaintiff's additional compensation was invalid. But, again, the summary judgment *evidence* establishes a plausible basis for concluding otherwise. First, Ms. Long's affidavit states that Plaintiff obtained approval of her additional compensation *prior* to the start of the 2016-2017 school year, consistent with the requirements of PM-3. Second, Ms. Long's affidavit also states that Plaintiff obtained approval from Dr. Damon Andrew—CHSE Dean—and ULS Superintendent Smith—a department head—consistent with the requirements of PM-69. For present purposes, the result is the same: Defendants' motion will be denied.

employment action. (Doc. 56 at 23). Plaintiff responds that the same evidence supporting her unpaid wages claim also establishes an actual violation of Louisiana law for purposes of her reprisal claim, because "from 2016 until her termination, [she] complained to LSU that it was refusing to pay her $15,000.00 wages owed." (Doc. 58 at 25).

As discussed, Plaintiff's unpaid wages claim survives summary judgment. And, of course, if Plaintiff ultimately proves her unpaid wages claim, she will have proved an actual violation of Louisiana's unpaid wages statute, La. R.S. 23:631. Nonetheless, Plaintiff's reprisal claim *still* fails because the plain terms of La. R.S. 23:631 provide that Plaintiff's right to unpaid wages (if any) arose "[u]pon ... discharge." In other words, if Defendants have violated the unpaid wages statute, Defendants' violation occurred *after* Plaintiff's termination, and therefore cannot be an unlawful activity that *preceded* an adverse employment action, as required by the whistleblower statute. Put simply, the timing is wrong.

Plaintiff fails to identify any additional statute supporting an actual violation of Louisiana law. Having failed to produce summary judgment evidence supporting an essential element, Plaintiff's reprisal claim will be dismissed. *Geiserman*, 893 F.2d at 793.

### v. Arbitrary Demotion

Plaintiff also alleges that, as a nontenured employee, she was demoted and terminated without being provided written reasons or an opportunity to respond, in violation of La. R.S. § 17:443(A). (Doc. 1-2 at ¶ 29). Defendants do not address this claim in their summary judgment briefing. Again, "the Court will not speculate on

arguments that have not been advanced, or attempt to develop arguments on Defendants' behalf." *Gray*, 2021 WL 1187076, at *5 (alterations omitted and quotation marks omitted). This claim will also proceed to the jury.

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendants' Motion For Summary Judgment (Doc. 55) be and is hereby **GRANTED IN PART**, and that Plaintiff's claim of reprisal in violation of La. R.S. 23:631 be and is hereby **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that, in all other respects, Defendants' Motion For Summary Judgment be and is hereby **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion For Leave To File Sur-Reply (Doc. 60) be and is hereby **DENIED**.

Baton Rouge, Louisiana, this 8th day of July, 2021

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**